UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| SLIDERS TRADING CO. L.L.C., | Case No. 17-cv-04930-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| WELLS FARGO BANK NA, | Re: ECF No. 18 |
| Defendant. | |

**INTRODUCTION**

Sliders Trading Company buys agricultural fertilizer from a non-party supplier called Grow More, Inc. A third party fraudulently impersonated Grow More and induced Sliders to wire funds to its bank accounts at Wells Fargo Bank. Sliders then sued Wells Fargo for negligence.[1] Wells Fargo moves to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on the ground that the Uniform Commercial Code displaces Sliders' negligence claim and otherwise provides immunity to Wells Fargo via its safe-harbor provision.[2] The court can decide the motion without oral argument under Civil Local Rule 7-1(b) and grants

---

[1] First Amended Compl. ("FAC") – ECF No. 17. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 18.

ORDER – No. 17-cv-04930-LB

the motion to dismiss with leave to amend.[3]

**STATEMENT**

**1. The Parties and Jurisdictional Facts**

Sliders Trading Company is a limited liability company organized under the laws of the United Arab Emirates and has its principal place of business in Dubai.[4] It imports agricultural fertilizers.[5] For the last fifteen years, it has purchased fertilizers from non-party Grow More, Inc., located in Gardena, California.[6] Grow More "sends invoices to Sliders by e-mail[,] and Sliders sends funds to [Grow More] by international wire transfer."[7] Grow More's "main operating account is at Citibank in California," and Sliders "is informed and believes, and on that basis alleges" that Grow More "maintains at least one bank account at Wells Fargo."[8] Wells Fargo is headquartered in San Francisco, California.[9] The four accounts used in furtherance of the fraud were located at Wells Fargo branches in (1) Atlanta, Texas, (2) Farmers Branch, Texas, (3) Los Angeles, California, and (4) Norfolk, Virginia.[10] Sliders alleges damages of $502,725.23.[11]

The court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2).

**2. The E-Mails and Fraudulent Inducement of the Wire Transfers**

Beginning around January 23, 2017, the party impersonating Grow More began sending Sliders a series of "spoof" emails that had domain names and email addresses that mimicked the

---

[3] All parties consented to magistrate-judge jurisdiction. *See* ECF Nos. 8, 10.
[4] FAC – ECF No. 17 at 2 (¶ 1).
[5] *Id.* at 3 (¶ 7).
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.* (¶ 2).
[10] *Id.*
[11] *Id.* at 12 (¶ 38).

ORDER – No. 17-cv-04930-LB 2

real Grow More, Inc.'s information.[12] An email sent on January 24, 2017 had bank-account information for a Wells Fargo account at the branch in Atlanta, Texas.[13] Sliders tried to wire funds to the account, and the funds were returned unpaid.[14] Sliders "is informed and believes, and thus alleges," that the funds were returned "due to an irregularity in the wire transfer instruction."[15] An email sent on February 4, 2017 purported to correct the routing and account numbers contained in the January 24 e-mail.[16] The wire-transfer instructions "identified the beneficiary as Grow More of 156000 New Century Drive, Gardena, California 90248" and identified the beneficiary account for the wire transfer as an account at the Wells Fargo branch in Atlanta, Texas.[17]

Sliders subsequently made three wire transfers to the Atlanta, Texas account: (1) $139,827 on February 5, 2017; (2) $151,250 on February 21, 2017; and (3) $211,648 on March 6, 2017.[18]

There also was a fourth wire transfer that Wells Fargo identified; ultimately, the funds were returned to Sliders. The events surrounding the aborted transfer are as follows.

On March 9, 2017, the person impersonating Grow More sent an email to Sliders and provided information for an account at the Wells Fargo branch in Farmers Branch, Texas.[19] In another email on March 16, the sender told Sliders to "disregard that new account number."[20] Sliders "is informed and believes, and on that basis alleges" that Wells Fargo "had identified an attempted fraud by its customer 'Grow More' no later than March 16, 2017 in connection with the Second Fraudulent Account and had closed the account but not taken any other action."[21] On March 22, 2017, the impersonator sent an email to Sliders with the bank-account information for a new

---

[12] *Id.* at 4 (¶ 10).
[13] *Id.* (¶ 11).
[14] *Id.*
[15] *Id.*
[16] *Id.* (¶ 12).
[17] *Id.*
[18] *Id.* (¶¶ 12–14).
[19] *Id.* (¶ 15).
[20] *Id.*
[21] *Id.*

ORDER – No. 17-cv-04930-LB  3

account at a Wells Fargo branch at "WE Hitter Blvd, CA 90022." The Wells Fargo branch on E. Whitter Boulevard in Los Angeles has the 90022 zip code.[22] The wire-transfer instructions identified the account beneficiary as Grow More, 15600 New Century Drive, Gardena, California 90248.[23] Sliders sent the fourth wire of $351,800 to the account at the Los Angeles branch on March 22, 2017.[24]

On March 25, 2017, the impersonator sent an email to Sliders "stating that there was an issue" with the wire sent on March 22, 2017, "based on a purported error with the account number."[25] The email said "that the payment had been rejected by the bank and that the bank would be returning all funds to Sliders" and advised Sliders "to follow up with Wells Fargo and to ask for a reversal."[26] Sliders "is informed and believes, and on that basis alleges" that the real Grow More told the Wells Fargo Branch in Los Angeles that it did not have an account there.[27] The March 25 email led Sliders to suspect fraud.[28] Sliders informed its bank — Bank of Baroda in the United Arab Emirates — of the fraud.[29] On March 28, 2017, it "confirmed the fraud" with Grow More.[30]

Bank of Baroda, Wells Fargo, and Standard Charter Bank — the intermediary bank that transmitted the wires to Wells Fargo — then exchanged a series of "SWIFT" messages.[31] "SWIFT" messages are used by banks to securely transmit information.[32]

On March 25, 2017, Bank of Baroda sent a series of SWIFT message to Wells Fargo that sought information about the four fraudulent wire transfers including amounts, dates, account

---

[22] *Id*. (¶ 16).
[23] *Id*. (¶ 17).
[24] *Id*.
[25] *Id*.
[26] *Id*. (¶ 18).
[27] *Id*.
[28] *Id*. at 6 (¶ 20).
[29] *Id*.
[30] *Id*.
[31] *Id*. (¶ 21). SWIFT stands for Society for Worldwide Interbank Financial Telecommunications. *Id*.
[32] *Id*.

ORDER – No. 17-cv-04930-LB    4

numbers, and beneficiaries.[33] The messages included the following statement: "AS REMITTER IS STATING THAT THE EMAILED ID HAS BEEN HACKED BY SOME UNKNOWN FRAUDULENT ELEMENTS, IT APPEARS TO BE FRAUD ATTEMPTED."[34] On March 29, 2017, Bank of Baroda sent a second series of messages that stated in part: "REMITTER HAS CONFIMED [sic] THAT THE MAIL WAS HACKED" and "sought to cancel the prior credit confirmation and instead consider a 'NEW RECALL REQUEST OF SAID FUNDS.'"[35]

Sometime between March 29, 2017 and April 3, 2017, Wells Fargo sent SWIFT messages to Bank of Baroda about the first wire and second wire transfers, stating that the funds had been withdrawn and that they thus were unable to comply with Bank of Baroda's requests to cancel or recall the wire transfers.[36] Bank of Baroda sent a SWIFT message asking for the name of the beneficiary, amount credited, date of credit, and any other available information.[37] Wells Fargo responded, "WE CONFIRM CREDIT" and "DUE TO BSA [Bank Secrecy Act] WE ARE UNABLE TO DISCLOSE FURTHER DETAILS." Bank of Baroda sent another message asking for the "complete registered address" of the beneficiary.[38] Sliders "is informed and believes, and on that basis alleges," that Wells Fargo did not respond to that request.[39] Regarding the second wire, in that same time period, Wells Fargo sent a SWIFT message to Bank of Baroda that stated in part: "PLS BE ADVISED THAT WE ARE NOT ABLE TO COMPLY WITH YR REQUEST AS NO FUNDS ARE REMAINING[.] PLS HAVE REMITTER CONTACT APPROPRIATE AUTHORITIES."[40]

On March 29, 2017, Standard Charter sent Bank of Baroda a SWIFT message that it had contacted Wells Fargo for a refund for the third wire and asking for information about the nature

---

[33] *Id.* (¶ 22).
[34] *Id.*
[35] *Id.* (¶ 23).
[36] *Id.* 6–7 (¶¶ 25–26).
[37] *Id.* 6–7 (¶ 25).
[38] *Id.*
[39] *Id.*
[40] *Id.* (¶ 26).

of the fraud and whether Sliders had a business relationship with the beneficiary of the transfer.[41] On April 3, 2017, Bank of Baroda responded "that there was a long-standing business relationship between Sliders and the legitimate customer [Grow More], and not the owner of the Fraudulent Account."[42] On April 6, 2017, Standard Charter Bank responded: "WE HAVE ONCE AGAIN CONTACTED WELLS FARGO BANK, N.A. FOR A REFUND. THEY ADVISED THE FOLLOWING QUOTE: WE ARE UNABLE TO APPLY WITH Y[OU]R R[E]Q[UE]ST UNTIL WE RECV AN INDEMNITY FROM YOURSELVES PLS PROVIDE A BANK CONTACT NAME, PHONE NUMBER, AND EMAIL ADDRESS TO SEND OUR TEMPLATE TO. ADV US IF YOU INTEND TO SEND AN INDEMNITY OR NOTIFY IF YOU NO LONGER WISH TO RECALL FUNDS. UNQUOTE."[43]

On April 6, 2017, the Grow More impersonator sent Sliders an email with account information for an account in Norfolk, Virginia.[44]

On April 10, 2017, Bank of Baroda sent Standard Charter a SWIFT message that Sliders agreed to give an indemnity and asking Wells Fargo to send its indemnity template.[45] Standard Charter sent the message to Wells Fargo sometime between April 10 and April 26, 2017.[46] On April 27, 2017, Standard Charter sent Bank of Baroda a SWIFT message that said in part that it had advised Wells Fargo of Baroda's response, and Wells Fargo responded: "PER OUR LOSS PREVENTION DEPT, NO INDEMNITY TO DATE SO WE NOW CLOSE OUR CASE."[47]

On April 30, 2017, Bank of Baroda sent Wells Fargo a SWIFT message reiterating that it had replied on April 11, 2017 that it requested the indemnity template and "HENCE THEIR POINT OF NO INDEMNITY TO DATE DOES NOT STAND HERE.[48] The message also said that Wells

---

[41] *Id.* at 8 (¶ 28).
[42] *Id.* (¶ 28(b)).
[43] *Id.*
[44] *Id.* (¶ 19).
[45] *Id.* (¶ 28(c)).
[46] *Id.* at 9 (¶ 28(d)).
[47] *Id.* (¶ 28(f)).
[48] *Id.* (¶ 28(g)).

Fargo's response — that it would reply "in due course" — meant that "Wells Fargo is in receipt of the April 11, 2017 indemnity consent message" and "questioned how Wells Fargo could close the case in three days when Wells Fargo had responded that it would reply 'in due course,' meaning that Bank of Baroda had to await a further response."[49] On May 6, 2017, Standard Charter sent a SWIFT message to Bank of Baroda that it had relayed the message to Wells Fargo.[50]

Sometime between May 18 and May 28, 2017, Standard Charter sent a SWIFT message to Bank of Baroda that stated: "BE ADV TEMPLATE WAS SENT DTD 12APR17 AND 2 ADDITIONAL WEEKS WERE GIVEN TO REPLY. SINCE NO INDEMNITY WAS RECEIVED CASE WAS CLOSED ON 01MAY17."[51] On May 28, 2017, Bank of Baroda sent a SWIFT message to Standard Charter Bank that stated: "WE HAVE NOT RECEIVED ANY TEMPLATE WICH [sic] SENT BY YOU SO PLEASE SENT US THE TEMPLATE AT OUR MAIL ADDRESS DEIRA AT RATE BANKOFBARODA-UAE.AE AS REMITTER IS CONTINEOUSELY [sic] FOLLOWING UP FOR HIS FUND. SO KINDLY RETURN THE FUND AS SOON AS POSIBLE [sic]."[52]

Similar correspondence was sent regarding the fourth wire transfer, "including a demand for indemnity but without providing any template for indemnity."[53] On April 15, 2017, Wells Fargo refunded the funds from the fourth wire transfer to Sliders.[54]

### 3. Slider's Additional Allegations About Wells Fargo's Negligence

After alleging the facts set forth above, the complaint says the following about negligence:

**Wells Fargo's Negligence**

> 31. Sliders is informed and believes, and on that basis alleges, that the Fraudulent Accounts were opened in violation of federal laws and regulations and

---

[49] *Id.*

[50] *Id.* at 9 (¶ 28(h)).

[51] *Id.* at 9–10 (¶ 28(i)).

[52] *Id.* at 10 (¶ 28(j)).

[53] *Id.* at 10 (¶ 29).

[54] *Id.*

ORDER – No. 17-cv-04930-LB        7

in violation of Wells Fargo's policies and procedures, and without adequate indicia that the individual(s) purporting to have the authority to open accounts in the name of "Grow More" were authorized to do so, particularly in light of the fact that GMI is an established California corporation. Furthermore, the cumulative effect of opening no fewer than four separate bank accounts in no fewer than three separate states under the same "Grow More" name raised red flags and indicated a heightened risk that these fake accounts were used to perpetuate fraud against customers of GMI such as Sliders.

32. Sliders is informed and believes, and on that basis alleges, that Wells Fargo knew or should have known that the First Fraudulent Account, the Second Fraudulent Account, the Third Fraudulent Account, and/or the Fourth Fraudulent Account were used to perpetuate fraud against customers of GMI such as Sliders.

33. Sliders is informed and believes, and on that basis alleges, that Wells Fargo knew or should have known that the First Fraudulent Wire, the Second Fraudulent Wire, the Third Fraudulent Wire, and/or the Fourth Fraudulent wire were misdirected to the Perpetrators instead of sent to GMI based on the irregularities with the transactions, including but not limited to the return of the Attempted Fraudulent Wire, the fact that the wire transfer instructions for the First Fraudulent Wire, the Second Fraudulent Wire, the Third Fraudulent Wire, and the Fourth Fraudulent Wire identified the beneficiary as Grow More of 15600 New Century Drive, Gardena, California 90248, which was not the address of the account holder, and that, Sliders is informed and believes, and on that basis alleges, at least one account at Wells Fargo in the name of "Grow More," the Second Fraudulent Account, had been closed by Wells Fargo.[55]

Sliders contends that Wells Fargo owed it — as a customer of Grow More and the originator of the wire transfers — a duty of care surrounding (1) the opening of the four fraudulent accounts, (2) Wells Fargo's acceptance and payment of the first three wire transfers; (3) Wells Fargo's receipt of the attempted fourth fraudulent wire; and (4) Wells Fargo's communications with Sliders regarding the third and fourth wires and the status of the funds.[56] It alleges that:

36. …Wells Fargo failed to exercise reasonable care in ensuring that the highly suspicious fake account openings and irregular wire transfer transactions were not fraudulent by, among other things, failing to undertake a reasonable inquiry or to implement or follow reasonable procedures to determine whether the individuals opening the multiple fake accounts were who they purported to be, whether the individuals opening the multiple fake accounts were authorized to open accounts in the name of GMI, whether the wire transfers originated by Sliders were misdirected, and whether the account holders were entitled to withdraw the funds from the fraudulent accounts.

37. In particular, and not in limitation of the foregoing, Wells Fargo breached its duty of care when it opened the First Fraudulent Account, the Second Fraudulent Account, the Third Fraudulent Account, and the Fourth Fraudulent Account; when it accepted and paid the First Fraudulent Wire, the Second

---

[55] *Id.* at 10–11 (¶¶ 31–33).

[56] *Id.* at 11 (¶ 35).

ORDER – No. 17-cv-04930-LB          8

Fraudulent Wire, and the Third Fraudulent Wire; when it sent incomplete and misleading SWIFT messages to Sliders regarding the status of the funds from the Third Fraudulent Wire; and when it failed and refused to return the remaining funds from the Third Fraudulent Wire which remained on deposit even after Wells Fargo had received specific notice from Sliders of the fraud and Sliders' claim to the funds.[57]

**GOVERNING LAW**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level . . . ." *Id.* (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, "'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). If a court dismisses a complaint, it should give leave to amend unless the "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

---

[57] *Id.* at 12 (¶¶ 36–37).

ORDER – No. 17-cv-04930-LB　　　　9

## ANALYSIS

### 1. The U.C.C. Displaces the Negligence Claim

Wells Fargo moves to dismiss Sliders's negligence claim on the ground that U.C.C. § 4A — adopted as Division 11 of the California U.C.C. — displaces Sliders's negligence claim and otherwise provides immunity to Wells Fargo via its safe-harbor provision.[58] Article 4A displaces any common-law claim if the U.C.C.'s provisions squarely cover the transactions at issue. *Zengen v. Comeria Bank*, 41 Cal. 4th 239, 244, 253–54 (2007). Here, the gravamen of the claim is that Wells Fargo should not have accepted and executed the fraudulent wires. The California Supreme Court has held that because the U.C.C. provides a remedy for a bank's processing of fraudulent payment orders, it displaces common-law claims like the negligence claim here. *Id.* at 251. The court thus dismisses the claim.

In the next sections, the court sets forth the specific U.C.C. provisions that apply here and then examines U.C.C. preemption of the negligence claim.

### 1.2 Claim Under the U.C.C.

Section 11104(a) of the California U.C.C. defines "funds transfer":

> (a) "Funds transfer" means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order."

Cal. Com. Code § 11104(a). The parties do not dispute that the wire transfers here were "funds transfers."

Section 11207(b) provides immunity to banks that process funds transfers to beneficiary account numbers identified in the transfer instructions:

> (b) If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:
>
> (1) Except as otherwise provided in subdivision (c), if the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the

---
[58] Mot. – ECF No. 18 at 10–13.

ORDER – No. 17-cv-04930-LB      10

number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person.

(2) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.

*Id.* § 11207(b).

Section 11207(b)'s immunity applies if the beneficiary's bank receiving the transfer instructions does not know that the beneficiary's name and account number refer to different persons. *TME Enterprs., Inc. v. Norwest Corp.*, 124 Cal. App. 4th 1021, 1030–31 (2004). "Knowledge" means "actual knowledge." *Id.* "[T]he beneficiary's bank has no duty to determine whether the name and account number specified in the wire transfer relate to the same person." *Id.* at 1031–32 (citations omitted).

The official comment to U.C.C. § 4A-207 explains the reasoning behind the safe-harbor provision:

> A very large percentage of payment orders issued to the beneficiary's bank by another bank are processed by automated means using machines capable of reading orders on standard formats that identify the beneficiary by an identifying number or the number of a bank account. The processing of the order by the beneficiary's bank and the crediting of the beneficiary's account are done by use of the identifying or bank account number without human reading of the payment order itself. The process is comparable to that used in automated payment of checks. The standard format, however, may also allow the inclusion of the name of the beneficiary and other information which can be useful to the beneficiary's bank and the beneficiary but which plays no part in the process of payment. If the beneficiary's bank has both the account number and the name of the beneficiary supplied by the originator of the funds transfer, it is possible for the beneficiary's bank to determine whether the name and number refer to the same person, but if a duty to make that determination is imposed on the beneficiary's bank the benefits of automated payment are lost....

*Id.* at 1032 (citing official comment to U.C.C. § 4A-207).

**1.2 U.C.C. Preemption**

Section 4A does not automatically displace all common-law claims. *Zengen*, 41 Cal. 4th at 252 (citing Cal. Com. Code § 11203); *see* Cal. Com. Code § 11203 (principles of law and equity apply unless displaced by particular code provisions). But in drafting Article 4A,

> a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the

> particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.
>
> Funds transfers involve competing interests—those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article.

*Zengen*, 41 Cal. 4th at 252 (quoting official comment to U.C.C. § 4A-102); *see Bridge Partners v. Citibank N.A.*, No. C-12-03048-WHA, 2012 WL 4936077, at *2 (Oct. 17, 2012); *Hunter v. Citybank, N.A.*, No. C-09-02079 JW, 2010 WL 2509933, at * (N.D. Cal. Feb. 3, 2010).

Moreover, when the statute applies, it "displaces other common law remedies and claims for relief (1) where the common law claims would create rights, duties, or liabilities inconsistent with division 11; and (2) where the circumstances giving rise to the common law claims are specifically covered by the provisions of division 11." *Bridge Partners*, 2012 WL 4936077, at *2 (citing *Zengen*, 41 Cal. 4th at 253). "[T]he exclusivity of Article 4A is deliberately restricted to any situation covered by particular provisions of the Article. Conversely, situations not covered are not the exclusive province of Article 4A." *Zengen*, 41 Cal. 4t at 254 (quotation omitted).

Here, section 11207(b) covers the circumstances of the fraud against Sliders. Sliders initiated four funds transfers with its bank, Bank of Baroda. Each transfer instruction named the beneficiary as "Grow More of 15600 New Century Drive, Gardena, California 90248."[59] The transfer instructions each identified the account numbers for the beneficiary bank accounts at Wells Fargo. Wells Fargo processed the payments to those accounts. Sliders does not allege that Wells Fargo knew that the transfers resulted from fraud or that the accounts did not belong to Sliders' genuine customer Grow More. *See TME Enterprs.*, 124 Cal. App. 4th at 1031.

---

[59] FAC – ECF No. 17 at 4–5 (¶¶ 13–15, 17).

ORDER – No. 17-cv-04930-LB 12

Sliders's argument is that Wells Fargo should have noticed red flags surrounding the transactions.[60] But that does not translate to Wells Fargo's actual knowledge. Allowing a common-law negligence claim would "create rights, duties, or liabilities inconsistent with [Article 4A/]division 11." *Zengen*, 41 Cal. 4th at 253. The U.C.C. displaces Sliders's negligence claim. *Id.*

The cases that Sliders cites do not support a contrary conclusion.

In *Sheerbonnet Ltd. v. Am. Exp. Bank, Ltd.*, the defendant bank credited transferred funds to an insolvent company's account (despite the bank's knowledge that the account was frozen) and then asserted its own right to the funds as an offset to the debt owed to it by the insolvent debtor. 951 F. Supp. 403, 405 (S.D.N.Y. 1995). That is a different scenario than the funds-transfer scenario here. The *Sheerbonnet* bank's self-dealing was not "directly addressed" in the U.C.C. and thus could proceed as a common-law claim. *Id.* at 412. By contrast, the funds transfers here are governed by the U.C.C.[61]

In *Schlegel v. Bank of Am., N.A.*, the plaintiff sued the Bank of America for an unauthorized funds transfer and for thereafter freezing the transferred funds instead of refunding them. 628 S.E.2d 362, 364 (Va. 2006). The U.C.C. preempted the common-law claim regarding the unauthorized funds transfer. *Id.* at 364, 368. But because the U.C.C. did not cover the bank's subsequent freezing of the funds, allowing common-law claims relating to that freezing did not create rights, duties, and liabilities that were inconsistent with Article 4A. *Id.* Again, the dispute here is about the fraudulently induced wire transfers, which is governed by Article 4A.

## 2. Negligence

Even if the U.C.C. did not displace the negligence claim, Sliders has not pleaded negligence.

The elements of a negligence claim are: (1) the existence of a duty to exercise due care;

---

[60] Opp. – ECF No. 19 at 7.

[61] Reply – ECF No. 24 at 7 ("This conduct is precisely governed by specific sections of the U.C.C.: 'unauthorized wire transfers (Cal. U. Com. Code, §§ 11201–11204), erroneous wire transfers (Cal. U. Com. Code, §§ 11205, 11207, 11208), amended and canceled wire transfers (Cal. U. Com. Code, § 11211), and erroneously executed wire transfers (Cal. U. Com. Code, §§ 11302–11305).' *See Chino Comm. Bank N.A.* [*v. Peters*], 190 Cal. App. 4th [1163], 1174 [2010].")

ORDER – No. 17-cv-04930-LB 13

(2) breach of that duty; (3) causation; and (4) damage. *See, e.g.*, *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 500 (2001). A duty to exercise due care is an "obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks." *McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (2008) (quotation omitted). The existence of a duty is a question of law and thus is often suited to a Rule 12(b)(6) disposition. *See Avila v. Citrus Cmty. College Dist.*, 38 Cal. 4th 148, 161 (2006).

Banks do not owe a duty of care to non-customers to protect them from the tortious conduct of the banks' customers. *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal. App. 4th 472, 479 (1996); *Rodriguez v. Bank of the West*, 162 Cal. App. 4th 454, 460–61 (2008). Moreover, imposing a duty of care is "'an expression of policy considerations leading to the legal conclusion that a plaintiff is entitled to a defendant's protection.'" *Vasquez v. Residential Inv. Inc.*, 118 Cal. App. 4th 269, 279 (2004). Even under general California negligence law, if a person has not created a danger, then generally he has no duty to come to the aid of another person (a victim) absent a relationship that gives rise to a duty to protect. *Zelig v. County of Los Angeles*, 45 P.3d 1171, 1182 (Cal. 2002); *accord McGarry*, 158 Cal. App. 4th at 995.

Sliders has not plausibly pled a relationship with Wells Fargo that gives rise to a duty of care.

## CONCLUSION

The court grants Wells Fargo's motion to dismiss and gives Sliders leave to file an amended complaint by January 18, 2018.

This disposes of ECF No. 18.

**IT IS SO ORDERED.**

Dated: December 18, 2017

_____
LAUREL BEELER
United States Magistrate Judge